**In re the Marriage of Allen Charles GLORVIGEN, Petitioner, Respondent,**

**v.**

**Sandy Vee GLORVIGEN, Appellant.**

**No. C9–88–1794.**

Court of Appeals of Minnesota.

April 25, 1989.

Peter J. Gleekel, Winthrop & Weinstine, St. Paul, for respondent.

Philip K. Arzt, Kathleen Worner Kissoon Law Office, Bloomington, for appellant.

Heard, considered and decided by HUSPENI, P.J., and CRIPPEN and IRVINE,* JJ.

## OPINION

HUSPENI, Judge.

Sandra Vee Glorvigen appeals from the trial court's denial of a motion to vacate or amend the judgment and decree of marital dissolution, which was based on a stipulation signed by the parties prior to a default hearing. We affirm.

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

## FACTS

The parties were married in 1965 and had no minor children at the time of the dissolution proceeding. In December 1987 appellant mentioned the possibility of marital dissolution to respondent, but the matter was held in abeyance until after the holiday season. In January 1988, appellant visited her parents in Arkansas and on January 28, 1988, she informed respondent by telephone that she was in Arizona planning a school reunion. Appellant returned home January 31, 1988 and on or about February 1, 1988, told respondent she wanted a dissolution as quickly as possible. At that time, respondent suggested that appellant make a list of the property and maintenance she wanted. Appellant then stated she had consulted a particular attorney in 1987 regarding dissolution, and thought she would receive more of the marital assets and more maintenance if she contested the matter.

The parties, at appellant's suggestion, met for about half an hour with the same attorney appellant had consulted in 1987. After the meeting, the parties decided to attempt to reach their own agreement on dissolution issues.

In early February, appellant gave respondent a summary of her marital property and maintenance requests. Generally, she wanted liquid assets. Respondent then compiled a net worth schedule of the parties' assets, obtaining the values on the real estate from professionals in the field and from personal knowledge. Respondent explained to appellant how he obtained these values and asked appellant if she wanted any other appraisals. Appellant accepted the values as obtained by respondent. Appellant was aware of the marital assets and of the general value of each, and had on occasion invested money for the parties.

As part of the dissolution property division, respondent offered appellant a certain mortgaged rental property for her residence. Appellant declined, stating she did not want any financial obligations. Respondent agreed to pay $600 a month maintenance at that time.

On or about February 15, 1988, the parties contacted an attorney to draft the papers necessary to complete the dissolution. After some discussion, respondent agreed to continue health insurance coverage for appellant through his employer.

On or about February 20, 1988, appellant informed respondent she was moving to Arizona March 2. Because the attorney did not have time to draft the necessary papers, he referred the parties to respondent's present attorney. Both parties wanted to complete the settlement agreement before appellant left for Arizona. Before communicating their agreement to respondent's present attorney, the parties orally agreed on the property division and maintenance provisions including an agreement to increase maintenance to $800 per month for the first year after dissolution. The stipulation was reduced to writing by the attorney. The summons and petition for dissolution of marriage was served on appellant February 26, 1988.

On March 1, 1988, at 4:00 p.m., the parties arrived at respondent's attorney's office to sign the stipulation. Appellant expressed reservations about the stipulation, and was told by respondent's attorney not to sign the document if she was uncomfortable, and to have another lawyer look it over for her. The attorney then left the room.

In reply to respondent's question regarding why appellant did not want to sign the stipulation, appellant replied she was confused by some of the language and was concerned that the agreement was not the same as that to which the parties agreed. Respondent assured appellant that although he did not understand all the language either, he had told the drafting attorney exactly what the parties had agreed upon, but that whether or not to sign was appellant's decision. Appellant then signed the document.

The stipulation contained the parties' agreement that the provisions of the stipulation constituted the full and complete disposition and settlement of all questions and issues of property rights and maintenance, as well as language acknowledging that

the parties had read and understood the contents of the stipulation, and that it would be offered and received at the default hearing. Additionally, there was language at the end of the document in which appellant acknowledged that she had been advised of her right to have counsel of her choice, that she expressly waived that right and that she had voluntarily signed the stipulation. Later that evening, the parties had dinner with their daughter.

The default hearing was held May 18. The findings of fact and conclusions of law incorporated the stipulation *in toto*, and the decree was entered May 24, 1988. The stipulation provided, inter alia, that:

1) Respondent would pay appellant monthly temporary maintenance starting at $800 for a year, then $712 for two years, then $600 for two years.

2) Respondent would maintain appellant on his health insurance for 36 months after date of the final decree.

3) Respondent would be awarded sole interest in six separate parcels of real estate or vendee's interest in a contract for deed of land (According to the record, the market values of the properties less: a) 10% selling expenses; b) taxes on capital gains at 34%; c) outstanding lien balances, yielded a net aggregate value of $19,525).

The parties divided various other property between them, including vendor's interests in two land contracts, two limited partnerships, various stocks, personal property and motor vehicles. They evenly divided the $71,725.73 equity of their former homestead. Respondent was solely responsible for the parties' $17,000 bank debt to Norwest Bank.

On June 8, 1988, the appellant moved for vacation or amendment of the judgment and decree, and for attorney fees. Appellant's accompanying affidavit stated that

she had multiple sclerosis making full-time work too taxing, and that she had expressed her discomfort with the terms of the stipulation agreement to respondent, but that after respondent exerted "additional pressure," she signed the papers. The trial court denied appellant's motion to reopen the decree, but did provide that the findings of fact be amended to set forth the financial circumstances of the parties.

## ISSUES

1. Did the trial court abuse its discretion in refusing to vacate the judgment and decree of May 24, 1988?

2. Was the property division in the judgment and decree a fraud upon the court?

3. Did the trial court abuse its discretion in failing to award attorney fees to appellant?

## ANALYSIS

1.

Upon appeal a trial court's determination whether or not to vacate a stipulation will not be disturbed in the absence of an abuse of discretion.

*Tomscak v. Tomscak*, 352 N.W.2d 464, 466 (Minn.Ct.App.1984).

Because the maintenance [1] and property division provisions of the decree about which appellant complains were based upon the written stipulation by the parties, the trial court's denial of appellant's motion must be examined "[w]ith a view towards the law on vacation of stipulations," *Yeager v. Yeager*, 405 N.W.2d 519, 522 (Minn. Ct.App.1987).

"Courts may set aside stipulations for fraud, duress or mistake." *Tomscak*, 352 N.W.2d at 466. In determining whether a trial court has abused its discretion by de-

---

1. With regard to maintenance, appellant also argues that the findings in the decree do not meet the requirements of Minn.Stat. § 518.552. However, appellant cites no authority which requires the trial court, in a fully stipulated matter, to make findings commensurate with those required when the trial court, itself, makes the decisions regarding amount and du-

ration of maintenance. Nonetheless, we note with approval the requirement of the trial court that the decree be amended to set forth the parties' respective financial positions at the time of the decree. Such recitation will assist a future court in the event either party seeks modification of maintenance pursuant to Minn.Stat. § 518.64.

nying a motion to vacate a stipulation, courts examine four factors:

 a. Whether the party was represented by competent counsel;

 b. Whether extensive and detailed negotiations occurred;

 c. Whether the party agreed to the stipulation in open court; and

 d. Whether when questioned by the judge the party acknowledged understanding the terms and considering them fair and equitable.

*See Pekarek v. Wilking,* 380 N.W.2d 161, 163 (Minn.Ct.App.1986) (citing *Tomscak,* 352 N.W.2d at 466).

The reviewing court considers whether the proceedings in the trial court substantially complied with each factor. *See Kroeplin v. Haugen,* 390 N.W.2d 872, 875 (Minn.Ct.App.1986), *pet. for rev. denied* (Minn. Sept. 25, 1986).

### a. *Competent Counsel*

■■■ In the present case, appellant was not represented by counsel during the negotiations which culminated in the execution of the stipulation on March 1, 1988. It is significant, however, that appellant had contacted an attorney (who is also her present counsel) in 1987 regarding the possible marital dissolution. Early in the 1988 negotiations, appellant told respondent that she had met with the attorney in 1987, and believed she would receive a more favorable property division and maintenance award if she contested the dissolution. This statement indicates appellant's awareness of a possibly less favorable property division and maintenance award if she proceeded without an attorney and by stipulation.

Although appellant was not actually represented by counsel during the period of negotiation and execution of the stipulation, we are satisfied that she, in fact, did have ample opportunity to retain representation. She twice discussed the possibility of representation with her present counsel, and appreciated the risk of proceeding alone.

We believe that *Tomscak* cannot be read so narrowly as to demand unequivocally that the allegedly aggrieved party has been represented by counsel at the time of stipulation. Such a narrow reading would effectively destroy the enforceability of any stipulation to which a pro se party is privy, and would in fact require that marriage dissolution termination agreements be executed only when each party is represented. Cases too numerous to cite urge the resolution of issues in marriage dissolution proceedings through stipulation. While unquestionably representation by counsel can aid immeasurably in resolving thorny issues and avoiding post-decree litigation, a party to a dissolution action often elects for economic or noneconomic reasons to proceed without legal representation. We conclude that it would exceed our proper function to effectively mandate that a commendable public policy ideal—agreement between the parties—could be achieved only when both parties were represented by counsel. We recognize, instead, that a knowing and voluntary waiver of counsel shall be sufficient to substantially meet the requirements of this *Tomscak* factor. The record before us fully supports a determination that appellant knowingly and voluntarily waived her right to representation.

### b. *Extensive and Detailed Negotiations*

■■ Negotiations between the parties occurred during a period of approximately one month, and covered issues of maintenance, property valuations and division, and health insurance coverage. Although most of the information relied upon by the parties during the negotiations was produced by respondent, this manner of obtaining information was with the knowledge and consent of appellant.

Appellant provided respondent with a summary of her requests regarding marital property and maintenance. Appellant wished to be free of financial or property obligations and wished to achieve liquidity. Although the parties discussed several options through which an equitable division of marital assets could be achieved, the method agreed upon assured for appellant the liquidity she desired. With regard to the maintenance provision, the parties' ini-

tial agreement for $600 per month was renegotiated by them and increased to $800.

The negotiations were highly detailed and comprehensive in nature. Change in the amount of maintenance indicates bargaining. Property valuations were agreed upon, and nothing in the record indicates that appellant was foreclosed from challenging the validity of any information before she signed the stipulation. We believe substantial compliance with the *Tomscak* requirement of extensive and detailed negotiations is met.

### c. *Agreement by the Party to the Stipulation in Open Court*

 Appellant did not communicate her agreement to the stipulation in open court. However, it was by appellant's own choice that she did not appear at the hearing. The record reveals no objectively compelling reason for appellant to leave for Arizona on March 2, 1988, no inability of appellant to briefly return to Minnesota for further negotiations or appearance in court, nor any inability to secure counsel to represent her during her absence.

Our analysis of this *Tomscak* factor parallels our earlier analysis of the requirement of representation by counsel. While we agree with the concurrence on the merit and advisability of personal appearance by a pro se party at the time of the stipulated default court hearing, we cannot agree that such appearance should be mandatory. Such requirement would, we believe, abrogate an individual's right for whatever reason—economic, employment, emotional, geographic or other—to remain away from a hearing that each party agrees will be default pursuant to stipulation. We believe that appellant both through agreement and through her conduct prior to the default hearing knowingly and voluntarily waived her right to be present in court and be questioned about the provisions of the parties' written stipulation.

### d. *Formal Expression to the Judge of Understanding and Acknowledging the Terms as Fair*

 For reasons similar to those discussed in "c" above, at a default hearing conducted pursuant to written stipulation, there is often no opportunity for the judge to question the party in default regarding understanding of the stipulated terms and acknowledgment of those terms as "fair." Under such circumstances, the trial court, while remaining cognizant of the fact that stipulations are only advisory to the court, may reasonably resort to the language in the stipulation itself. Here the parties agreed that

> the foregoing provisions constitute the full and complete disposition and settlement of all questions and issues of property rights, spousal maintenance, attorney fees and costs, and all other property and financial issues existing between the parties * * *.

Further, there is a formal recitation at the end of the stipulation that "the parties have read the foregoing Marital Termination and Stipulation Agreement, [and] understand the contents therein * * *." Signatures of the parties follow. The language in the stipulation regarding understanding the terms and accepting the agreement as final and binding is a reasonably equivalent expression to the court of understanding and acknowledging the terms as fair.

Although there is not literal compliance with the last *Tomscak* factor, our earlier analysis of the parties' negotiations, appellant's knowledge of the extent and nature of the parties' marital estate and appellant's knowing and voluntary waiver of her right to counsel and right to appear in person to be questioned by the court regarding her agreement with the stipulation, support our conclusion that as to the fourth *Tomscak* factor also appellant made a knowing and voluntary waiver.

*Yeager v. Yeager,* 405 N.W.2d 519 (Minn. Ct.App.1987) supports the conclusion of the trial court that "[appellant] has not alleged a basis for the reopening of the judgment and decree." In *Yeager,* appellant had not objected to the stipulation, had waived the right to counsel, and had approved a default hearing. Based on the appellant's

acquiescence over a period of four years, this court affirmed denial of the motion to vacate the judgment and underlying stipulation which addressed a maintenance issue. *See id.* at 523 n. 2, which includes a warning of the potential risk of relying on judgment where the matter is "presented to the court on a stipulation with a waiver of both counsel and appearance."

We recognize the seriousness of the concerns raised in *Yeager* and in the special concurrence here regarding the integrity of stipulations based upon waiver of counsel and nonappearance of a pro se party. However, we believe these legitimate concerns must be answered not by rigidly applied rules, but by exercise of the trial courts' broad discretion and flexibility in dealing with the parties and issues in the cases coming before those courts. Trial courts must be assured of the continuing flexibility needed by them to deal with individual parties and individual cases. Parties must be assured of their right, as adults, to seek resolution of the issues present in their marriage dissolution through whatever means they personally deem valid. Despite the advisability of both personal appearance and consultation with counsel, a strict requirement for both may inject legal compulsion and process into a highly personal area of decision making.

Finally, we note that the facts of this case differ substantially from those cases in which the parties appear in the courtroom prepared for final contested hearing on all issues and only at that time engage in successful stipulation negotiations. *See, e.g., Kroeplin v. Haugen,* 390 N.W.2d 872, 874–75. The stipulation achieved in such setting is seldom reduced to writing until a later time, if at all. Instead, the stipulation is entered orally into the record by one or both attorneys. In such circumstances, it is critically important that each party be questioned as to his or her understanding and agreement with the terms of the stipulation. That avoval of understanding and agreement is the only basis upon which the final default dissolution hearing, now pursuant to stipulation, may proceed.

2. Appellant also contends that the overall property division constituted a fraud upon the court, citing to *Lindsey v. Lindsey,* 388 N.W.2d 713 (Minn.1986).

Minnesota has not defined "fraud upon the court." It is fraud connected with the presentation of a case to the court, and differs from the "intrinsic or extrinsic" fraud envisioned by clause (3) of Minn.R.Civ.P. 60.02. 2A D. Herr & R. Haydock, *Minnesota Practice,* § 60.24 (1985). Dissolution judgments have been vacated for "fraud upon the court." *See Cahaley v. Cahaley,* 216 Minn. 175, 12 N.W.2d 182 (1943) (where counsel for the husband had promised wife an extension of time to answer but then obtained a default judgment); *Berg v. Berg,* 227 Minn. 173, 34 N.W.2d 722 (1948) (where the wife claimed husband had forced her to stipulate to a default judgment by means of threats of physical harm and by service upon her of allegedly defamatory affidavits of proposed witnesses); *Schroetke v. Schroetke,* 365 N.W.2d 380 (Minn.Ct.App.1985) (where husband allegedly fraudulently misrepresented to wife the extent of his child support obligations and had intimidated her into believing that if she obtained counsel he would prevent her from obtaining custody of the child).

*Angier v. Angier,* 415 N.W.2d 53, 56 (Minn. Ct.App.1987).

[a] finding of fraud upon the court and the administration of justice must be made under the peculiar facts of each case.

*Lindsey* at 716.

In this case, appellant produced no evidence that suggests an inherent flaw in the presentation of the case to the court. There is no evidence which shows that respondent coerced or tricked appellant into pursuing less than full and fair litigation with representation of counsel, as was the situation in *Cahaley, Berg* and *Schroetke.* Nor is there any evidence of the severe mental illness and psychological dependency that was present in *Lindsey* which "precluded [wife] from being able to fairly and reasonably understand the matters under

consideration." *Lindsey* at 716. The parties' daughter with whom they had dinner following the signing of the stipulation indicated in her affidavit that:

> Both my parents were in a surprisingly good mood considering they had just signed their marital termination agreement. I found the evening to be very pleasant with no signs of strain between the two or any signs that [appellant] was displeased with the terms of the agreement or that she had been coerced into agreeing to or signing the same.

Appellant's reliance on *Lindsey,* in which the court was concerned about wife's ability to understand the process of stipulation, is misplaced. Appellant's argument regarding fraud focuses more on the result of the parties' stipulation and less on the process by which that stipulation was reached. To the extent appellant does discuss process, such as her lack of counsel and lack of appearance at the hearing, these factors were within her control. Appellant's claims of pressure by respondent to sign the stipulation are vague and clearly contradicted by other evidence in the record. We discern no error in the trial court's refusal to find fraud upon the court in the overall property division.

We note in conclusion that in her post-decree motions appellant appears to not so much question the judgment of the trial court in approving the stipulation as to question her agreement to it in light of subsequent events in her life. The record reflects that appellant's post-stipulation attempts to work full time were unsuccessful because it became too taxing for her.[2] Such allegations are insufficient to reopen a decree.

▮ 3. In dissolution proceedings, [a]llowance of attorney's fees is within the discretion of the court. * * * [T]he standard of review requires a finding of a clear abuse of discretion.

2. Without deciding the matter, it appears to this court that relief for appellant might have been possible under Minn.Stat. § 518.64 in a motion to modify maintenance either as to amount or duration or both. We do not believe such a motion for modification would be foreclosed

*Lammi v. Lammi,* 348 N.W.2d 372 (Minn. Ct.App.1984) (citations omitted); *see also* Minn.Stat. § 518.14 (1986).

The record shows appellant and respondent both have expenses that exceed their respective incomes. Appellant was awarded $800 per month maintenance, has contract for deed income of $243 per month, and was awarded considerable liquid assets. The record does not show that she required financial assistance to pursue her motion for vacation or amendment of the judgment and decree. *See Hall v. Hall,* 417 N.W.2d 300, 303 (Minn.Ct.App.1988). As such there is no clear showing of an abuse of discretion in the trial court's denial of an award of attorney fees to appellant.

## DECISION

Because the record shows appellant voluntarily chose to sign the stipulation and to proceed without counsel by a default hearing, there is no abuse of discretion by the trial court in refusing to vacate or amend the judgment and decree of dissolution as to maintenance. The record is devoid of evidence suggesting a fraud upon the court as to property division. Considering the relative financial status of the parties and their abilities to secure assistance of counsel, there was no abuse of discretion by the trial court in denying appellant's motion for attorney fees.

Affirmed.

CRIPPEN, Judge, concurring specially.

1.

To review a decision that vacates a stipulation and decree, we have repeatedly turned to Minnesota Supreme Court decisions permitting relief upon proof of fraud, mistake, or duress. *Steel v. Steel,* 305 Minn. 504, 505, 232 N.W.2d 104, 105 (1975); *Hafner v. Hafner,* 237 Minn. 424, 429, 54 N.W.2d 854, 857 (1952). Addressing the

under the recent case of *Karon v. Karon,* 435 N.W.2d 501 (Minn.1989). The specific agreement by the parties to divest the court of jurisdiction to modify maintenance, present in *Karon,* is absent from the stipulation here.

same question, the supreme court has also said that an agreement on the terms of a decree may be disregarded if improvidently made "and in equity and good conscience" the agreement should not stand. *John v. John*, 322 N.W.2d 347, 348 (Minn.1982).

There is no precedent for setting aside a stipulation and decree because it is based on bad judgment or produces a bad result. Prior decisions make it evident that improvidence by itself is not a cause for relief. To set aside the stipulation and decree, it must also be shown that a bad decision was made involuntarily or as a result of fraud or mistake.

Quite simply, appellant here has failed to show a valid reason to set aside the prior stipulation and decree. There may be merit in her claim that she got inadequate maintenance and health insurance benefits. She acknowledges, however, agreeing to provisions on those subjects. She has claimed neither fraud nor mistake. As to possible duress, she has made only conclusory observations that she was "not comfortable" with the terms of the stipulation and that some "pressure" was exerted by respondent when the stipulation was signed.

Summarily disposing of appellant's claim, the trial court found that she had "not alleged a basis" for reopening the judgment. This finding of the trial court is correct and can be affirmed without further elaboration.

### 2.

The so-called *Tomscak* factors have nothing to do with the trial court's decision in this case. *See Tomscak v. Tomscak*, 352 N.W.2d 464 (Minn.Ct.App.1984). These factors, highlighting the need for involvement of the court and counsel in a party's acknowledgment of consent to a stipulation, demonstrate the kind of case where the trial court may disregard probative evidence that a party acted under duress, mistake or fraud. It is unnecessary here to examine the *Tomscak* factors because appellant made no showing of cause for reopening the decree.

I concur specially because of concern for our discussion of the *Tomscak* factors.

Having proceeded inadvisably to discuss policy on the stipulation process, the mischief should not be compounded by publishing an invitation for poor procedure.

Under *Tomscak*, consent to a stipulation and decree may be protected from attack by a record that a party has consulted with counsel on the stipulation and has personally demonstrated to the court an understanding and acceptance of the terms and conditions of the proposed decree. *Id.* at 466. The converse of *Tomscak* should be equally evident: when not protected by these factors, consent is vulnerable to attack. Upon any showing of fraud, mistake or duress, absent careful process there is a clear risk the stipulation and the resulting decree will be set aside.

In my opinion, a party may not waive or somehow be estopped from pointing out the need for either adequate advice of counsel or declarations in open court. Certainly, a party may waive the right to counsel. Indeed, a party may wholly default on claims in a dissolution case. It is quite another thing, however, to suggest that a party's waiver of process establishes consent for the complicated resolution of vital issues in a proposed stipulation. Where judicial action is premised on personal consent to a stipulation, without evident involvement of counsel for both parties on the contents of the document, the court must inquire of both parties to justly determine whether consent has actually occurred.

One reads in our decision the prescription for summary approval of written stipulations, whether or not each party has consulted with counsel, and with personal appearance by only one of the parties. Such summary process may be expedient, but pennies of that expediency are offset by pounds of mischief. As long as we suffer haphazard approval of stipulations, we risk serious episodes of court-sanctioned injustice, and we invite a bulging pattern of expensive and unnecessary post-judgment litigation. Worse still, because unjust decisions are not always attacked through formal process, we enlarge the occurrence of

self-help efforts to destroy acceptance of judicial decrees.

The risks of error in summary approval of stipulations are demonstrated by the facts here. The parties addressed complex issues, including the valuation and division of property, pension interests, and an award of maintenance arising after a 23-year marriage. To deal with these and other dissolution issues, counsel for respondent drafted a 21-page stipulation. The difficulty of dissolution issues, like those here, is patently beyond the grasp of most parties, regardless of their experience. Adding to the hazards for parties who deal with these issues, they are often acting during the course of one of the most distressing experiences of their lives.

The errors arising through poor handling of stipulations are as critical as they are likely to occur. The process of the case should not belittle the importance of decisionmaking on dissolution issues. The parties in these matters are engaging in unraveling decades of their lives and shaping their futures. Also, absent successful vacation of the stipulation, the settled judicial interest in finality sets in stone many of the agreements the parties make. *See Karon v. Karon*, 435 N.W.2d 501 (Minn.1989). When assessing the serious consequence of the settlement process, one should also look beyond the facts of this case to the critical subjects of custody and support for children.

The settlement process employed in this case is unacceptable. The specific arrangements appellant made were not discussed with a lawyer acting for her interest. The language of the lengthy stipulation was not examined by counsel for appellant. The dissolution court had no contact with appellant except to observe her signatures on the stipulation document. Except for a court finding that the parties entered into the stipulation, and that the agreement is "fair and reasonable," the record shows no inquiry or findings by the court on the merits of critical ingredients of the stipulation or the reliability of appellant's purported consent to its terms.

What process is appropriate? In my opinion, the trial courts should demand, alternatively, that the record show 1) personal appearance by each party, together with inquiry on their understanding of vital parts of the stipulation, their consent for the terms prescribed, particularized on critical agreements, and their explanation of the merits for accepting concessions they make, or 2) verification that each party has consulted with separate counsel on the content of the stipulation document, together with the usual inquiry to the party who appears regarding the merits of all critical agreements.

Beholden as we should be to good process in family law matters, for the sake of fairness and finality, showing regard for all interests affected by these proceedings, we should not minimize the importance of the fact that consent to a stipulation is made without the advice of counsel and is not personally confirmed before the trial court.